**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4051-19

K.G.,

     Plaintiff-Respondent,

v.

B.N.,

     Defendant-Appellant.

_____

          Submitted May 11, 2021 – Decided May 25, 2021

          Before Judges Yannotti and Mawla.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1898-20.

          Antonio J. Toto, attorney for appellant.

          Respondent has not filed a brief.

PER CURIAM

Defendant B.N. appeals from a final restraining order (FRO) entered in favor of plaintiff K.G. on June 30, 2020, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

Plaintiff testified the parties dated for approximately six months until defendant assaulted plaintiff on February 21, 2020, sending her to the hospital with a head contusion and a bruised rib. Plaintiff obtained a temporary restraining order (TRO) against defendant as a result of the assault, but "ended up dropping the TRO because [she felt] sorry for [defendant] and . . . believe[d] that he would stop and he would have left [her] alone." After this incident, plaintiff deleted defendant's telephone number from her telephone.

On May 31, 2020, plaintiff was visiting a friend in South River when, at 2:00 a.m., plaintiff began to receive text messages from an unknown number stating: "[I]t's funny how you're in my . . . fucking town. I'm going to walk into that house and I'm going to beat up everybody that's in that house. . . . I'm going to beat up the [person[1]] that you're with. . . . I'm coming now."

Plaintiff testified that shortly after receiving the texts from the unknown number, defendant appeared at her friend's residence. She stated: "[Defendant]

---

[1] We note that the text message used a racial slur to describe the person plaintiff was with.

A-4051-19

approached the homeowner . . . [and] I was watching him hearing the whole thing over the Ring camera that the homeowner has. [Defendant] at the time was intoxicated . . . and he approached [the homeowner] and said 'you know why the fuck I'm here, don't play stupid'." Plaintiff testified defendant had a beer in his hand and "became agitated . . . and sa[id ']I'm here for my girlfriend, I know she's inside.[']" She stated she "was already on the phone with officers inside of the home waiting for them to arrive." Plaintiff testified that officers arrived and advised defendant to leave the premises. Plaintiff obtained the TRO the same day.

Defendant also testified, and claimed he "was still under the impression that [the parties] were still together." He claimed plaintiff dismissed the prior TRO because the parties reconciled and asserted the parties "were together" from the dismissal of the first TRO until the May 2020 incident. Defendant testified the May encounter was happenstance. He claimed he was at a friend's home near plaintiff's location, and as he was walking home, noticed her vehicle in the driveway of a residence. He testified he went to plaintiff's friend's residence because he "just wanted to know why she was in town."

Defendant admitted he was intoxicated, but denied he made threats or a racial slur during his attempt to confront plaintiff. He also conceded he pushed

3

plaintiff during the February 2020 incident, that his mother called the police, and plaintiff went to the hospital as a result.

On her re-direct testimony, plaintiff denied the parties had reconciled. She stated: "We were not officially together, judge. We sat there and we were trying to work things out, because I was giving him a second chance for beating and assaulting me."

The trial judge found plaintiff's testimony "very credible." He concluded plaintiff had proved the history of domestic violence, noting although defendant minimized his conduct, he did not deny the February 2020 assault and plaintiff's subsequent hospitalization.

Regarding the predicate act, the judge found defendant incredible and rejected his testimony that he happened upon plaintiff's vehicle on the way home. The judge found plaintiff's version of the events "to be more credible when she says [that] while at the address she received a text message and that there was some offensive language being used about who she was with and that [defendant] threatened he was coming to the house . . . and would assault the occupants of the home." The judge concluded plaintiff's "version of the offense makes more sense . . . ." He noted even if he believed defendant's version that

4

the encounter was by chance, defendant's conduct still constituted harassment because of its confrontational nature and the early hour in which it occurred.

The trial judge concluded plaintiff proved defendant committed harassment as defined by "the catch-all provision" of the harassment statute, which states:  "[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:  (a) [m]akes, or causes to be made, a communication or communications . . . [in] any other manner likely to cause annoyance or alarm[.]"  N.J.S.A. 2C:33-4(a).  The judge made the following findings:

> [T]he catch-all provision is what applies here, does the defendant have a right [at three] in the morning to approach the plaintiff and demand that he have a conversation when she's at someone else's house . . . [?] And the answer is no.
>
> Would that cause annoyance or alarm? Absolutely.  Particularly with the language that was being used about coming to the home, demanding that she came out of the residence.  But more importantly, you put this in context with the history that there was an assault that took place in February despite the fact that the two of them were trying to get their relationship back on course.  That is not [germane] to the issue of whether or not his conduct that night, that morning, was [a] form for harassment.
>
> And the court finds that the answer to that is yes. The standard's simply preponderance of the evidence. And the court finds that [defendant] had no right to

5

demand that she come outside at some[one] else's house 3:00 a.m. in the morning, particularly when you had some drinking . . . and particularly by his own admission he had a few drinks.

Given the assaultive behavior in the past[,] that would certainly alarm someone. And the court finds that the predicated act has been proven by the preponderance of the evidence.

The trial judge granted the FRO.

On appeal, defendant argues the record does not support the court's finding he committed domestic violence. He repeats the claim he thought the parties were a couple. He asserts there was no testimony plaintiff told him to stop contacting her, and he merely went to the home to ask about her and left when he was told do so, which does not constitute harassment.

In domestic violence matters, the trial court's findings of fact are binding on appeal "if supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). Deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." Ibid. "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Ibid. (quoting Pascale v. Pascale, 113 N.J.

6

20, 33 (1988)). Thus, "an appellate court should not disturb the 'factual findings and legal conclusions of the judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (citing Rova Farms, 65 N.J. at 484)).

In light of these principles and having thoroughly reviewed the record, we reject defendant's arguments as without merit and affirm substantially for reasons set forth in the trial judge's opinion. We add the following comments.

In State v. Hoffman, 149 N.J. 564 (1997), our Supreme Court explored the meanings of N.J.S.A. 2C:33-4 and its subparts. Writing for the Court, Justice Coleman noted the statute's requirement that a defendant must have acted with purpose "may be inferred from the evidence presented. . . . Common sense and experience may inform that determination." Id. at 577 (citations omitted).

In discussing N.J.S.A. 2C:33-4(a), the Court also stated: "[T]he term 'annoyance' should derive its meaning from the conduct being scrutinized. . . . [S]ubsection (a) proscribes a single act of communicative conduct when its purpose is to harass. Under that subsection, annoyance means to disturb, irritate, or bother." Id. at 580. Furthermore, the Court stated:

> The catchall provision of N.J.S.A. 2C:33-4(a) should generally be interpreted to apply to modes of

communicative harassment that intrude into an individual's "legitimate expectation of privacy." . . .

Thus, in enforcing subsection (a) of the harassment statute, we must focus on the mode of speech employed. That subsection of our statute, like those elsewhere, is "aimed, not at the content of the offending statements but rather at the manner in which they were communicated."

[Id. at 583 (quoting State v. Fin. Am. Corp., 182 N.J. Super. 33, 39-40 (App. Div. 1981).]

Contrary to defendant's arguments, the record does not support the inference that his intent to communicate with plaintiff was for a legitimate reason. The credible testimony and common sense point to the fact that defendant's intent was to cause plaintiff annoyance or alarm by invading her privacy. Indeed, the sequence of the events, namely, defendant discovering plaintiff's vehicle, texting her in a vulgar manner, and appearing at the residence shortly thereafter and not leaving until police arrived instructing him to do so, do not support the conclusion he was present out of concern for plaintiff's welfare. Furthermore, in light of the admitted history of domestic violence, we, like the trial judge, are unpersuaded by defendant's assertion that the parties were a couple.

The Hoffman Court held that trial courts must "examine the totality of the circumstances, especially and including the context of domestic violence, in

8

determining whether subsection (a) has been violated." Id. at 584. The totality of the circumstances presented do not lead us to a different conclusion than the trial judge.

Finally, we have stated: "The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim." Silver v. Silver, 387 N.J. Super. 112, 126 (App. Div. 2006).

> Although this second determination--whether a domestic violence restraining order should be issued-- is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse.
>
> [Id. at 127.]

Although the record does not expressly contain Silver findings, it is because the substantial credible evidence proved plaintiff's need for the protection of an FRO was "perfunctory and self-evident." Indeed, as the Court has stated: "At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." Hoffman, 149 N.J. at 584. The FRO entered here accomplishes just that.

9

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4051-19